IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SIDNEY L. COLEMAN and LAKESHA M. JOHNSON,

      Plaintiffs,
 v.

MAGGIE THOMAS, KURT SCHWAHN,
GENOVEVA CALDERSON, MICHELE KRUEGER,
CHRISTOPHER DUBMAN, LEANN MOBERLY,
and AMR YASSIN,

      Defendants.

OPINION and ORDER

18-cv-673-jdp

---

 While Sidney Coleman was on probation, Wisconsin probation agents would not let him have contact with his girlfriend, Lakesha Johnson, because one of his convictions was for strangling Johnson. Agents later issued a warrant for Coleman's arrest, on the ground that he violated his probation by failing to complete domestic-violence treatment. Coleman and Johnson are co-plaintiffs in this lawsuit. They allege that defendants, the probation agents, violated their constitutional rights to familial association by prohibiting Coleman from contacting Johnson. They also allege that defendants violated Coleman's Fourth Amendment rights by falsely arresting him for a probation violation.

 Defendants move for summary judgment. Dkt. 25. I will grant that motion because defendants are entitled to qualified immunity on the familial-association claims. And, even crediting Coleman's version of the facts, defendants had reasonable suspicion to believe that he had violated the terms of his probation by failing to participate in domestic violence treatment.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiffs Sidney Coleman and Lakesha Johnson are in a long-term relationship and have four children together. The defendants are Christopher Dubman, Leann Moberly, Amr Yassin, Kurt Schwahn, Michele Krueger, Maggie Thomas, and Genoveva Calderon. All of the defendants worked for the Wisconsin Department of Corrections Division of Community Corrections. Only defendants Dubman, Moberly, Yassin, and Schwahn are mentioned in the parties' proposed findings of fact; Dubman, Yassin, and Schwahn were probation and parole agents, and Moberly was a supervisor.

This case concerns how defendants handled Coleman's probation starting in 2017. Coleman had previously been incarcerated for convictions in two cases. In Dane County Case No. 11CF90, Coleman pleaded no contest to second-degree recklessly endangering safety by use of a dangerous weapon and two counts of misdemeanor bail jumping. In Dane County Case No. 15CF2288, Coleman pleaded guilty to strangulation and suffocation and disorderly conduct, both modified with a domestic-violence enhancement. The victim in the 2015 case was Johnson: after an argument between them, Coleman placed his knee on the left side of her neck, restricting her breathing for two or three minutes. After Johnson freed herself, Coleman used his hands to choke her for another one or two minutes.

In addition to the sentence Coleman received in the 2015 case, his probation on the 2011 case was revoked. In revoking Coleman, the administrative law judge stated, "When he is released, I recommend a no contact rule regarding Johnson, until he has completed domestic violence and anger management treatment and possibly AODA again as well." Dkt. 31-2, at 59.

Coleman was released from prison on March 10, 2017. He was placed under the supervision of defendant probation agent Schwahn. Coleman's rules of supervision required that he maintain complete sobriety and that he "make every effort" to cooperate with counseling or treatment that was offered. Dkt. 31-1, at 87. He was also prohibited from having any contact with Johnson other than for purposes of child pickup. Coleman had proposed to live with Johnson upon his release, but Schwahn denied the request.

From June to August 2017, Coleman was held in the Dane County Jail as a suspect in a stabbing case. Prior to this detention, Coleman had also been having contact with Johnson. Coleman was released from the Dane County Jail in late August 2017, after signing an "Alternative to Revocation" (ATR). Probation staff uses an ATR to give a probationer another chance to comply with the rules instead of seeking revocation. Under the ATR, Coleman admitted to having contact with Johnson and he agreed to attend a residential services program; he lived at the treatment facility until November 10, 2017. He was then granted his request to live at his mother's house.

A few days later, Coleman was taken into custody after probation staff learned that he had had contact with Johnson. He was offered a second ATR. In the ATR, Coleman admitted that he had contact with Johnson. Coleman agreed to stay in temporary housing for 90 to 120 days and successfully complete domestic-violence class, or face revocation. Coleman attempts to dispute that he was required to complete domestic-violence class, but that condition is in the ATR agreement that he signed. *See id.* at 30.

In early March 2018, Coleman left temporary housing and went to a hotel to live with his brother and be closer to his job. In late April 2018, Coleman had completed more than half of his domestic-violence treatment and he had maintained employment for more than four

3

months. Defendant Dubman, who was by then Coleman's probation agent, talked to supervisor Moberly and they decided to modify Coleman's rules: the no-contact rule regarding Johnson was lifted and they created a new rule of no violent contact with Johnson. Coleman was allowed to live with Johnson.

In May 2018, Coleman lost his job and he was discharged from domestic-violence programming at Lake City Counseling. Staff there told Dubman that Coleman was not welcome to return because of his hostile and disrespectful attitude. Dubman requested that Coleman attend the DOC's Day Report Center for domestic-violence programming.

In early July 2018, Coleman called Dubman and asked him to approve Coleman moving to La Crosse. The parties dispute exactly was said in this conversation. Coleman says that he told Dubman that he would live in a hotel with his family until he found a permanent residence, and that he would work through a temp agency. Dubman says that Coleman would not explain where he would be living or working. The parties agree that Dubman denied Coleman's request.

The next day, July 3, Coleman reported to defendant agent Yassin for intake at the Day Report Center. The parties agree that after speaking with Coleman, Yassin sent Coleman away and that Coleman did not participate in domestic violence programming at the Day Report Center. The parties give different versions of what Coleman and Yassin said to each other. According to Yassin, Coleman was argumentative and his attitude was "toxic." Dkt. 28, ¶ 4. Yassin further states: "Coleman told me he would go to programming, but would not participate, as he was moving to La Crosse in 2 weeks." *Id*. Coleman denies making the most antagonistic statements that Yassin attributed to him, such as that he did not care if he were revoked or sent to prison. Dkt. 35, ¶ 15. But Coleman's declaration does not deny that he told Yassin that he would not actively participate in the programming because he wanted to move

4

to La Crosse and he would rather do the programming there. In a written statement made after he was arrested, Coleman substantially confirmed this aspect of the interaction:

> I [was] discussing my prior enrollment in the DV class and the time I already spent in class. I asked if I could get credit for those classes or if I had to do it all over again. I also informed [Yassin] that I was planning on moving to La Crosse and wanted to do the program there. I informed [him] that it would be a waste of time for me to start here if I was moving.

Dkt. 31-1, at 42.

Yassin terminated Coleman from the Day Report Center group. Dubman emailed Yassin to ask him whether Coleman showed up for treatment and whether he was cooperative. Yassin responded that Coleman had been extremely uncooperative. Dubman then issued a warrant for Coleman's arrest for violating the terms of his probation, including by (1) having unauthorized contact with Johnson, (2) being terminated from domestic-violence programming at Lake City Counselling, and (3) by failing to attend domestic-violence programming at the Day Report Center. Coleman turned himself in. Both Coleman and Yassin prepared written statements about their encounter on DOC-1305 "Statement" forms. *See* Dkt. 31-1, at 42–43.

Coleman was offered another ATR at Milwaukee Secure Detention Facility, where he would receive domestic violence treatment and his alcohol and drug concerns would be addressed. Coleman refused to sign the ATR, so Dubman initiated revocation proceedings. The administrative law judge revoked Coleman's supervision in his 2011 and 2015 cases and ordered him reincarcerated for thirteen months.

ANALYSIS

I allowed plaintiffs to proceed on two sets of claims: the first under the First and Fourteenth Amendments against defendants Thomas, Schwahn, Calderon, Krueger, Dubman,

and Moberly for the unnecessary imposition of a no-contact probation condition; the second under the Fourth Amendment against defendants Yassin, Dubman, and Moberly for his July 2018 detention.

## A.  No-contact order

Coleman and Johnson have rights under the First and Fourteenth Amendments to associate with members of their family. *See Overton v. Bazzetta*, 539 U.S. 126 (2003). They also "have a fundamental due process right to care for and raise their children." *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002). But supervision via parole and probation may limit an offender's rights, without violating the Constitution. *See United States v. Knights*, 534 U.S. 112, 119 (2001) ("Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.").

Generally, a parolee's or probationer's First Amendment right of association may be restricted so as long as the restriction is reasonably related to achieving the goals of supervision. *See United States v. Showalter*, 933 F.2d 573, 575 (7th Cir. 1991); *Morales v. Schmidt*, 489 F.2d 1335, 1343 (7th Cir. 1973). I am aware of no Supreme Court or Seventh Circuit decisions specifically addressing the constitutionality of supervision conditions that eliminate contact among family members, but district courts in this circuit have upheld them. *See Christophel v. Brandl*, No. 08-CV-755, 2010 WL 1050412, at *10 (E.D. Wis. Mar. 17, 2010) (upholding no-contact condition between probationer and his wife because of history of violent interactions between them); *Weiss v. Spielvogel-Donalds*, No. 16-CV-219-JPS, 2017 WL 3726986, at *10 (E.D. Wis. Aug. 28, 2017) (finding probation agent entitled to qualified immunity regarding claim about no-contact condition between probationer and girlfriend).

In screening this claim, I warned plaintiffs that "I suspect that there may have been a good reason for the no-contact order; plaintiffs discuss Coleman's domestic-violence programming, which suggests that the no-contact order may have been premised on prior acts of domestic violence in the Coleman-Johnson household." Dkt. 14, at 4. The facts established at summary judgment confirm that suspicion: Coleman was convicted of domestic-abuse-related charges for choking Johnson. There appears to be good reason for the restriction, so if I were to decide plaintiffs' familial-association claims on the merits, plaintiffs would not likely succeed.

But I will not reach the merits, because defendants properly invoke the doctrine of qualified immunity. That doctrine shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation omitted). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Plaintiffs bear the burden of demonstrating that their rights were clearly established to overcome qualified immunity. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011).

Plaintiffs contend that defendants are not entitled to qualified immunity because "the rule . . . was not eminently reasonable." Dkt. 32, at 13. But that's not the question. To overcome qualified immunity, plaintiffs must point to clearly established law forbidding factually similar misconduct. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017) ("the clearly

7

established law must be 'particularized' to the facts of the case." (citation omitted)); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) ("[T]he clearly established right must be defined with specificity."). Plaintiffs don't identify a decision of the United States Supreme Court or the Seventh Circuit court of appeals in support of their familial-association claims, and my own research does not uncover any factually similar cases either. Without binding precedent clearly prohibiting the challenged conduct, defendants are entitled to qualified immunity on these claims.

**B. July 2018 arrest**

Coleman brings Fourth Amendment claims against defendants Yassin, Dubman, and Moberly for his arrest in July 2018.

The Fourth Amendment protects the right of individuals to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. Parolees and probationers have reduced Fourth Amendment rights; they may be searched or seized on the basis of "reasonable suspicion" that the person violated the terms of his supervision, parole, or probation. *Knights*, 534 U.S. at 121; *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003). The reasonable-suspicion standard requires "'something less than probable cause but more than a hunch,' which exists when there is some 'objective manifestation' that a person is, or is about to be, engaged in prohibited activity." *Knox*, 342 F.3d at 659 (quoting *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003)).

At screening, I characterized the Fourth Amendment claim as one that defendants Yassin, Dubman, and Moberly "set [Coleman] up" by arresting him even though Yassin told him that he could miss a domestic-violence class without consequence. *See* Dkt. 14, at 5.

1. **Defendant Yassin**

I'll start with Yassin. Plaintiffs' theory is that at the Day Report Center intake in July 2018, Yassin told Coleman that he could leave treatment for the time being while they sorted out whether Coleman's previous programming could count toward his current treatment. But later Yassin told Dubman a different story: that Coleman was uncooperative and that he said he didn't care if he got revoked. And that, according to plaintiffs, is what led Dubman to issue the arrest warrant for a probation violation.

Plaintiffs start with a sound legal theory. Under the Fourth Amendment, officers may not intentionally or recklessly provide false information to obtain a warrant. *United States v. Leon*, 468 U.S. 897, 926 (1984); *Knox*, 342 F.3d at 658 (same analysis applies for warrant concerning violation of supervised release). Likewise, an officer similarly may not intentionally or recklessly withhold material information in seeking a warrant. *Whitlock v. Brown*, 596 F.3d 406, 410–11 (7th Cir. 2010). These standards also apply to officers "who provided information material to the . . . determination" to issue the warrant, *Leon*, 468 U.S. at 923 n.24, which was Yassin's role in these events.

Coleman has adduced evidence to dispute Yassin's statements that Coleman was argumentative and toxic. Coleman says that he did not tell Yassin that he didn't care about possible revocation or that he wasn't afraid of going back to jail, and at summary judgment I must credit Coleman's version if it is supported by admissible evidence. I'll also credit Coleman's declaration statement that "[Yassin] told me I had done nothing wrong and that he would follow up with Dubman and the counselor from my last group to see if I could continue where I left off or would have to start over." Dkt. 35, ¶ 16. So, for purposes of summary judgment I'll assume that Yassin provided false information to Dubman about July 3 incident.

But that's not the end of the analysis. Coleman's arrest would not violate the Fourth Amendment if, after eliminating Yassin's false statements or omissions, Dubman still had reasonable suspicion that Coleman was violating the terms of his probation. *See Betker v. Gomez*, 692 F.3d 854, 862 (7th Cir. 2012). ("We eliminate the alleged false statements, incorporate any allegedly omitted facts, and then evaluate whether the resulting 'hypothetical' affidavit would establish probable cause."); *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) ("The materiality of an omitted or misrepresented fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause.").

I conclude that, even accepting Coleman's version of events and eliminating Yassin's false statements and omissions, Dubman still had a reasonable suspicion to support the arrest warrant. Coleman was required to successfully complete domestic-violence programming, and he had resisted efforts to accomplish that, even before the July 3 incident. Two months prior to meeting with Yassin, Coleman was terminated from domestic-violence programming at Lake City Counseling because of his hostile and disrespectful attitude. So even without the July 3 incident, Dubman had a basis to revoke Coleman.

But Dubman gave Coleman another chance and arranged for programming at the Day Call Center. Coleman says that he was "very receptive" to programming there, but I won't credit that statement for two reasons. First, Coleman's subjective state is not material, so it does not matter what Coleman thought about the programming. Second, Coleman's statement is contradicted by his own written statement about the incident: Coleman said that it would be a waste of time to take part in the programming at the Day Report Center because he was going to be moving anyway—even though Dubman had already denied his request to move to

10

La Crosse. Coleman offered to stay in the group that day, but only to stay out of trouble. When he was given the option to leave without participating in treatment, Coleman took it. So even if things happened as Coleman says, Dubman had a reasonable suspicion that Coleman wasn't going to complete domestic violence programming. So Yassin's alleged false statements are not material to the reasonable suspicion analysis, and Coleman cannot succeed on his Fourth Amendment claim against him.

### 2. Defendants Dubman and Moberly

Coleman's claims against Dubman and Moberly (Dubman's supervisor) fail because they had reasonable suspicion necessary to issue the warrant, for the reasons explained above. Another reason to grant summary judgment for these defendants is that they have absolute immunity for issuing a warrant. Parole and probation agents and their supervisors are entitled to absolute judicial immunity for any "quasi-judicial" functions they perform as part of revocation proceedings. *Smith v. Gomez*, 550 F.3d 613, 617–18 (7th Cir. 2008). These include the "decision to grant, revoke, or deny parole, or the signing of an arrest warrant," *Dawson v. Newman*, 419 F.3d 656, 662 (7th Cir. 2005) (citation omitted).

Coleman argues that Dubman worked with Yassin to "set him up" and that Dubman issued the warrant as retaliation for him complaining about Dubman. But Coleman doesn't provide any evidence showing either of these things. Coleman doesn't explain how he knows that Dubman retaliated against him, and the only evidence we have showing communications between Yassin and Dubman is Yassin's email saying that Coleman was uncooperative; there's no evidence that Dubman knew that Yassin was lying about his encounter with Coleman. In any event, these arguments go nowhere given Dubman's absolute immunity regarding issuing

the warrant. So I'll grant summary judgment to defendants on the Fourth Amendment claims against Dubman and Moberly.

Defendants have also filed a motion to stay the remainder of the schedule pending a decision on the motion for summary judgment and because of the COVID-19 pandemic. Dkt. 40. I will deny that motion as moot because I am denying all of plaintiffs' claims.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 25, is GRANTED.
2. Defendants' motion to stay the schedule, Dkt. 40, is DENIED as moot.
3. The clerk of court is directed to enter judgment for defendants and close the case.

Entered April 20, 2020.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge